

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

———————————————

## No. 07-17-00245-CR

———————————————

### JEFFERY SCOTT ESTRADA, APPELLANT

### V.

### THE STATE OF TEXAS, APPELLEE

On Appeal from the 154th District Court
Lamb County, Texas
Trial Court No. DCR-5428-16; Honorable Felix Klein, Presiding

February 19, 2019

## OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Following a plea of not guilty, Appellant, Jeffery Scott Estrada, was convicted by a

jury of engaging in organized criminal activity, a first degree felony,[1] and sentenced to

---

[1] TEX. PENAL CODE ANN. § 71.02(a)(5) (West Supp. 2018). As applicable to the facts of this case, an offense under section 71.02(a) is one category higher than the most serious predicate offense listed under subsection (a) that was committed. § 71.02(b). The "most serious" predicate offense allegedly committed in this case was delivery of methamphetamine of more than 200 grams but less than 400 grams; TEX. HEALTH & SAFETY CODE ANN. § 481.112(e) (West 2017), punishable as a special punishment felony, by imprisonment for life or for a term of not more than 99 years or less than 10 years and a fine not to exceed $100,000. *Id.* Accordingly, the offense in this case was punishable by imprisonment for life or for a term of not more than 99 years or less than 15 years, without the option of a fine. TEX. PENAL CODE ANN. § 71.02(b)(3) (West Supp. 2018).

seventeen years confinement. By two issues, Appellant contends (1) the evidence is insufficient to establish that he committed the offense of engaging in organized criminal activity as alleged in the indictment and (2) the trial court erred in admitting his written statement and an audio recording of his interrogation, over objection, because he did not knowingly, intelligently, and voluntarily waive his rights before making the oral and written statements. We reverse based upon an unassigned error and remand for a new trial;[2] however, in the interest of justice and because the remaining issues could afford Appellant greater relief,[3] we have reviewed, but overrule issues one and two.

BACKGROUND

On May 8, 2014, Joaquin Coronado, Appellant's cousin, and Mandy McKinley were arrested in Plainview. Mandy had methamphetamine on her person and Joaquin had an outstanding warrant. While in custody, they were interviewed by Agent Jeffrey Ashburn of the Criminal Investigation Division of the Texas Department of Public Safety regarding a methamphetamine distribution enterprise in Littlefield.

According to Mandy, an admitted addict, she met Joaquin in January 2014, while he was incarcerated with her ex-husband. In March 2014, Joaquin subsequently sought her out to see if she could provide him with methamphetamine. The two used methamphetamine together and Joaquin began staying with her. At the time, Mandy had a source for obtaining methamphetamine, but when her source was arrested in mid-March, she contacted her niece in Amarillo to find a new source. Mandy's niece put her in touch with a temporary source and eventually connected her and Joaquin with Kenneth

---

[2] *See Sanchez v. State*, 209 S.W.3d 117, 120-21 (Tex. Crim. App. 2006).

[3] *See Darcy v. State*, 07-13-00297-CR, 2015 Tex. App. LEXIS 6593, at *3 (Tex. App.—Amarillo June 25, 2015), *rev'd on other grounds*, 488 S.W.3d 325, 326 (Tex. Crim. App. 2016).

2

Charles Dahl in mid-to-late March as their exclusive source. At first, Kenneth was delivering "quarters" (seven grams) to Joaquin and Mandy. As the frequency of their trips to Amarillo increased, so did the weight of the methamphetamine provided by Kenneth. Mandy testified that for "a couple of weeks," they drove to Amarillo "every day," taking alternate routes to avoid suspicion. Their routine was to purchase one ounce (28 grams) on one day and two ounces the next day and they alternated between one and two ounces thereafter. They bought the methamphetamine in bulk and she would weigh it. At Joaquin's insistence, each ounce was divided into sixteenths (1.75 grams) which he would then "front" to others who would sell it for him.

Pursuant to a series of questions from the prosecutor on the business of drug dealing, Mandy explained that "fronting" the methamphetamine meant providing the product to group members who in turn would sell it and bring back the money.[4] She disagreed with Joaquin's business practice of "fronting" because members of the group were using most of the methamphetamine and not bringing back enough cash to replenish their supply of methamphetamine. At times, she was forced to use her own money to "re-up" the supply. By April 2014, she became frustrated when strangers began coming and going from her apartment to obtain methamphetamine from Joaquin.

Mandy met Appellant in March 2014, through Joaquin, and the three began using methamphetamine together. She recalled Appellant accompanying her and Joaquin to Amarillo on one trip to buy methamphetamine. She also witnessed Joaquin give Appellant some of the methamphetamine.

---

[4] Generally, a "dime" or a tenth (0.10) of a gram sold for ten dollars, a "dove" or two tenths (0.20) of a gram sold for twenty dollars, a "sixteenth" or one and three quarters (1.75) of a gram sold for one hundred dollars, and an "eight ball" or three and a half (3.5) grams sold for two hundred dollars.

Appellant, also an admitted methamphetamine user, either purchased or did favors for Joaquin in exchange for methamphetamine. Appellant would keep some for personal use and at times, sold some for profit to pay his bills and make his car payment. He claimed he obtained methamphetamine in an amount of 1.75 grams at a time. On two occasions, Joaquin and Mandy enlisted him to cash forged payroll checks for profit. In that enterprise, Appellant kept more than half of the cash as his profit.

Joaquin and Mandy were arrested on May 8, 2014. Almost six weeks later, on June 24, 2014, Appellant was arrested for possession of methamphetamine. More than a week later, on July 2nd, while still in custody, he was interviewed by Agent Ashburn regarding distribution of methamphetamine between March 2014 and May 2014.

During the interview, which lasted over two hours, Appellant was properly admonished regarding his *Miranda* rights on two separate occasions. Appellant admitted he was a methamphetamine addict and that Joaquin controlled the methamphetamine distribution enterprise. At the time of Appellant's interview, several members of the criminal combination alleged by the State were already in custody.

Over the course of the interview, Appellant admitted that he acquired methamphetamine from Joaquin in exchange for favors. Appellant also admitted he was enlisted to cash the two forged payroll checks for Joaquin with fake identification provided by Mandy and that after cashing the checks, he kept a large portion of the cash for himself.[5]

---

[5] After Appellant cashed the two checks, he discovered that two of his sons had become involved with Joaquin's enterprise and they had a falling out.

4

Appellant denied he was selling methamphetamine for Joaquin and claimed the methamphetamine provided to him was for his personal use. He later admitted he sold some of the methamphetamine for profit. He described how he would buy 1.75 grams of methamphetamine at a time for eighty dollars and then resell it for one hundred dollars. He also named at least three persons to whom he sold methamphetamine.

Appellant further admitted traveling to Amarillo with Joaquin and Mandy on one occasion to meet Mandy's source at a truck stop. He denied seeing the source but knew they had acquired methamphetamine because they did not have any with them when they left for Amarillo. When asked by Agent Ashburn if Appellant would agree that Joaquin "pretty much ran the show here in Littlefield as far as selling meth," Appellant agreed that Joaquin "was the man."

In exchange for Agent Ashburn notifying the district attorney of Appellant's cooperation, Appellant agreed to make a written statement describing the methamphetamine operation and the check-cashing scheme. Appellant acknowledged that there were no guarantees in exchange for his cooperation. In his written statement, Appellant implicated "Felix, Ashley, and Tawny" as other participants "in the deal" with Joaquin. After writing his statement, Appellant affixed his signature to it. He also identified other associates in a photo lineup.

The evidence outlined a methamphetamine distribution ring headed by Joaquin. He and his co-conspirators, including Appellant and Mandy, would travel to Amarillo from Littlefield to obtain methamphetamine from Kenneth to be distributed to surrounding towns. Quantities transported by Joaquin and his associates ranged from ounces to pounds of methamphetamine.

5

In an eleven-page indictment, returned on April 12, 2016, Appellant was charged with the felony offense of engaging in organized criminal activity. In relevant part, the indictment alleged that Jeffery Scott Estrada:

> [O]n or about and between the 1st day of March, 2014 through the 15th day of May, 2014, and before the presentment of this indictment, in [Lamb County, Texas], did:
>
> Then and there knowingly deliver or possess with the intent to deliver a controlled substance in Penalty Group 1, to-wit: Methamphetamine, in an amount of 200 grams or more but less than 400 grams.
>
> And the defendant did then and there commit said offense with the intent to establish, maintain, or participate in a combination or in the profits of a combination, said combination consisting of three or more of the following individuals: Kenneth Charles Dahl, Joaquin Manuel Coronado, Mandy Beth McKinley, Celina Laiz Rodriguez, Ashley Kohl Rios, Eliseo Joel Martinez, Santiago Vizcarra, Jr., Isidro Lopez, Rodney Trevino, Jr., Summer McFadin, Felix Delarosa, Gillyan Goodwin, Natasha Rodriguez, Amanda Silvas, William Grant, Tawny Castillo and Jonathan Estrada, who collaborated in carrying on the heretofore criminal activity, by agreeing with one another that they would engage in conduct constituting said offense, and each individual named above, together with one or more of those individuals, performed an overt act in furtherance of said agreement, to-wit: [whereupon the indictment lists ten pages of "overt acts."]

At no time did Appellant move to quash the indictment or otherwise object to the indictment on the basis that *possession with intent to deliver* is not a predicate offense for purposes of the offense of engaging in organized criminal activity.[6] At trial, when the jury charge tracked the indictment, Appellant again did not object on that basis. After submission of the case to the jury, it returned a general verdict of guilty as to the offense of engaging in organized criminal activity and then later assessed Appellant's punishment at seventeen years confinement in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

---

[6] *See infra* pp. 8-9.

A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination . . . the person commits or conspires to commit one or more of the following: [enumerated predicate offenses]." TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2018). The predicate offenses are then listed in the eighteen enumerated subsections to section 71.02(a). The subsection relevant to this particular prosecution is subsection five which provides as follows:

> (5) unlawful manufacture, delivery, dispensation, or distribution of a controlled substance or dangerous drug, or unlawful possession of a controlled substance or dangerous drug through forgery, fraud, misrepresentation or deception;

TEX. PENAL CODE ANN. § 71.02(a)(5).

The gravamen of the offense of engaging in organized criminal activity is a circumstance surrounding the conduct—the existence or creation of a combination that collaborates in carrying on criminal activities. *O'Brien v. State*, 544 S.W.3d 376, 391 (Tex. Crim. App. 2018). A "combination" requires three or more persons who collaborate in carrying on criminal activities. § 71.01(a) (West Supp. 2018). "Profits" means property constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in section 71.02. § 71.01(c) (West Supp. 2018). "Conspires to commit" means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties. § 71.01(b) (West Supp. 2018). The overt act "need not be criminal in itself" and "acts that suffice for party

7

liability—those that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense—would also satisfy the overt act element of section 71.02." *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003).

CHARGE ERROR—UNASSIGNED ISSUE

Here, the predicate offenses alleged in both the indictment and the jury charge for the offense of engaging in organized criminal activity were (1) delivery of a controlled substance, to-wit: methamphetamine, in an amount of 200 grams or more but less than 400 grams and (2) possession with intent to deliver, a controlled substance, to-wit: methamphetamine, in an amount of 200 grams or more but less than 400 grams. The indictment further alleged that Appellant committed one or more of these predicate offenses as part of a collaboration of three or more persons "agreeing with one another that they would engage in conduct constituting said offense."

As a matter of unassigned error, we note that *possession with intent to deliver* is not a predicate offense enumerated in section 71.02(a). *See Walker v. State*, No. 07-16-00245-CR, 2017 Tex. App. LEXIS 2817, at *5-6 (Tex. App.—Amarillo March 30, 2017, pet. granted) (mem. op., not designated for publication); *State v. Foster*, No. 06-13-00190-CR, 2014 Tex. App. LEXIS 5877, at *4 (Tex. App.—Texarkana June 2, 2014, pet. ref'd) (mem. op., not designated for publication) (stating that "the terms of [section 71.02(a)(5)] are not violated by simply possessing a controlled substance with the intent to deliver it" and concluding the trial court properly quashed an indictment alleging organized criminal activity based on the predicate offense of simply possessing a controlled substance with intent to deliver). Simple possession of a controlled substance is a predicate offense only if committed through forgery, fraud, misrepresentation, or deception. *See* § 71.02(a)(5). Additionally, "possession with intent to deliver" cannot be

8

incorporated into "delivery" to legitimize an incorrect predicate offense. *See Hughitt v. State*, 539 S.W.3d 531, 537 (Tex. App.—Eastland 2018, pet. granted). An incorrectly alleged predicate offense is fundamental error where, as here, it cannot be ascertained whether the jury voted to convict based upon the proper predicate offense of delivery of a controlled substance or the improper predicate offense of possession with intent to deliver. *See Fraser v. State,* 523 S.W.3d 320, 342 (Tex. App.—Amarillo 2017, pet. granted) (finding that when a jury charge allows for conviction on a theory not supported by the law, the verdict cannot stand).

Although the Court of Criminal Appeals has determined that the enumerated predicate offenses listed under section 71.02(a) are merely alternate manner and means of committing the offense of engaging in organized criminal activity and are not elements of the primary offense; *O'Brien*, 544 S.W.3d at 391, such a distinction is of little consequence where, as here, the jury charge allows for a conviction based upon facts which do not constitute the offense charged. It is simply a fundamental constitutional principle that one cannot be convicted for something that does not constitute a criminal offense. *Posey v. State,* 545 S.W.2d 162, 163 (Tex. Crim. App. 1977) (holding that "if it is the manner and means by which an act is done that makes the otherwise innocent act a criminal offense, it is necessary to allege facts showing the manner and means which make the act a criminal offense"); *Hughitt,* 539 S.W.3d at 536 (vacating a section 71.02(a) conviction where the predicate offense was possession of a controlled substance with intent to deliver).

Furthermore, the error need not be preserved through objection by Appellant and it may be raised *sua sponte* by a reviewing court as unassigned error. *Walker*, 2017 Tex. App. LEXIS 2817, at *7 (finding charge error allowing a jury to convict based on facts that

9

do not constitute an offense to be egregiously harmful and thus warranting reversal of the judgment based on unassigned error); *Sanchez v. State,* 209 S.W.3d 117, 120-21 (Tex. Crim. App. 2006) (holding same).

Because the jury charge in this case allows for a conviction based upon facts that do not constitute the offense of engaging in organized criminal activity, Appellant's conviction cannot stand. Accordingly, based on this unassigned error, the judgment of the trial court is reversed.

PROPER REMEDY

In *Bowen v. State,* 374 S.W.3d 427 (Tex. Crim. App. 2012), the Texas Court of Criminal Appeals held that if an appellate court concludes the evidence supporting a conviction is legally insufficient, the court is not necessarily limited to ordering an acquittal but may instead reform the judgment to reflect a conviction as to any lesser-included offense and remand for a new punishment hearing. *Id.* at 431-32. In *Arteaga v. State,* 521 S.W.3d 329, 340 (Tex. Crim. App. 2017), the Court further expanded the application of *Bowen* and its progeny to a cause involving jury-charge error. While the error in this case can be described as jury-charge error, unlike the facts in *Arteaga,* the error here deals with the merits of the offense itself—not just a fact affecting the appropriate range of punishment. The error in the charge at hand permitted the jury to convict Appellant of the offense of engaging in criminal activity based upon a theory authorized by law and a theory not authorized by law. This difference sufficiently distinguishes the opinion in *Arteaga* from the facts of this case and renders application of *Bowen* and its progeny inappropriate to the facts of this case.

Here, the verdict rendered by the jury was a general verdict—meaning we are unable to determine whether some or all of the jurors believed Appellant was guilty of engaging in organized criminal activity based upon a theory authorized by law (delivery of a controlled substance) or upon a theory not authorized by law (possession with intent to deliver a controlled substance). Because the record supports both possibilities, the appropriate remedy is not to acquit or to reform the judgment of conviction. The appropriate remedy is to reverse and remand for a new trial. *See Stromberg v. California,* 283 U.S. 359, 367-70, 51 S. Ct. 532, 75 L. Ed. 1117 (1931) (holding remand for a new trial to be the appropriate remedy when conviction was based on a general jury verdict encompassing both a constitutional and an unconstitutional theory of conviction); *Fraser,* 523 S.W.3d at 335-36 (holding remand for a new trial was appropriate where erroneous jury charge allowed for conviction based upon a theory authorized by law and a theory not authorized by law). Therefore, the appropriate remedy in this case is to reverse the conviction and remand this cause to the trial court for a new trial. While our disposition of this unassigned error renders unnecessary the consideration of Appellant's two issues, because we are remanding this matter to the trial court for further proceedings, in the interest of justice, we will address Appellant's issues to determine if they would afford him any greater relief. *See* TEX. R. APP. P. 47.1.

Addressing Appellant's issues in a logical rather than numerical order, we need to first review his second issue by which he challenges the suppression of certain evidence, before we review his first issue by which he challenges the sufficiency of the evidence to support his conviction.

11

MOTION TO SUPPRESS CONFESSION—ISSUE TWO

By his second issue, Appellant contends the trial court erred by admitting, over objection, a written statement and audio recording of his interrogation because he did not knowingly, intelligently, and voluntarily waive his rights before making those statements. At the hearing on his motion to suppress, Appellant testified he had been using methamphetamine three to four times a day several weeks before his arrest and he was not in his right mind when he gave his oral and written statements more than a week after last using methamphetamine. He claimed he was still under the influence of methamphetamine when he gave his statements and did not remember voluntarily providing the contents of his statements. During cross-examination, although he claimed not to be an expert, he testified it takes three days to get methamphetamine out of his system after a "regular hit"; but, he was using greater quantities.

Agent Ashburn, a nineteen-year veteran of the Department of Public Safety, testified he would not have conducted an interview with an intoxicated suspect. To do so would have tainted the information. According to Agent Ashburn, Appellant knew where he was and responded appropriately to all questions. In his experience, an intoxicated suspect would have been jittery, unable to sit still, and would have rambled. Appellant did not exhibit any of those characteristics. Neither did Appellant appear tired, exhausted, or sleepy during the lengthy interview.

The trial court acknowledged reviewing two hours and ten minutes of Appellant's taped interview. In denying the motion to suppress, the court found that Appellant was properly admonished and understood his rights. His interview was coherent, he understood what he was doing, and he gave appropriate responses. Appellant "was in

full control of his mental faculties" and "wasn't influenced any way that rendered his confession involuntary."

We review a trial judge's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to a trial judge's determination of historical facts that the record supports especially when the trial judge's findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We review the trial court's findings in the light most favorable to his ruling and determine whether the evidence supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). Second, we review a trial court's application of the law to the facts de novo. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.*

Article 38.22, section 2(b) of the Texas Code of Criminal Procedure provides that no written or oral statement of an accused is admissible unless the accused is given statutory warnings and "knowingly, intelligently, and voluntarily" waives those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b) (West 2018). Whether a confession was voluntarily made is to be determined by the totality of the circumstances. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). An accused's intoxication is a factor to consider in evaluating the voluntariness of a confession. *Leza v. State*, 351 S.W.3d 344, 351 (Tex. Crim. App. 2011); *Bell v. State*, No. 07-14-00028-CR, 2015 Tex. App. LEXIS

2211, at *3 (Tex. App.—Amarillo March 9, 2015, no pet.) (mem. op., not designated for publication).

Evidence at the suppression hearing showed that Appellant had been in custody for eight days prior to his interview and, therefore, presumably since last using methamphetamines.[7]  When he gave his oral and written statements, he was properly advised of his rights, and although at the hearing on his motion to suppress, he claimed he was still under the influence of methamphetamines and could not have voluntarily made his statements, he never made those claims during his interview.

In addition to the testimony presented at the suppression hearing, the trial court listened to Appellant's interview and determined that his statements were voluntarily made.  This court's review of the interview is consistent with the trial court's finding that Appellant's statements were voluntarily made.  Eight days had lapsed since Appellant had last used methamphetamine.  Appellant was clear and coherent in his answers to Agent Ashburn's questions.  He was cooperative and did not ramble.  There was no indication of coercion or intimidation during the interview.  Appellant made an independent and informed decision to give an oral and written statement to Agent Ashburn.  Applying the appropriate standard of review, we find the trial court's finding that Appellant's confession was voluntary is reasonably supported by the record and there was no error in admitting the confession during trial.  Issue two is overruled.

---

[7] Numerous references in the record are made to "nine" days having passed since Appellant's arrest on June 24, 2014, and his custodial interrogation on July 2, 2014.  However, the time period between those dates is eight days.

14

By his first issue, Appellant contends the evidence is insufficient to establish the elements of engaging in organized criminal activity. He emphasizes that the State failed to prove his intent to participate in the combination as well as his co-conspirators' intent to participate in the combination. We disagree.

The only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*. See Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). We consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

We give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.*

In evaluating the sufficiency of the evidence, we compare the elements of the offense as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik v. State*, 953

S.W.2d 234, 240 (Tex. Crim. App. 1997)).  In our review, we must evaluate all of the evidence in the record, both direct and circumstantial and whether properly or improperly admitted.  *Jenkins*, 493 S.W.3d at 599; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  When the record supports conflicting inferences, we presume the fact finder resolved the conflicts in favor of the prosecution and defer to that determination.  *Jackson*, 443 U.S. at 326.

As discussed hereinabove, and as defined by a hypothetically correct jury charge under the indictment in this case, the elements of the offense of engaging in organized criminal activity are as follows:

(1) with the intent to establish, maintain, or participate in a combination or in the profits of a combination;

(2) the accused commits or conspires to commit;

(3) delivery of a controlled substance.

TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2018).[8]

While the State was required to prove not only that Appellant intended to establish, maintain, or participate in a group of three or more persons, it was also required to establish that the members of that group intended to work together in a continuing course of criminal activities.  *O'Brien*, 544 S.W.3d at 391; *Dowdle v. State*, 11 S.W.3d 233, 235-36 (Tex. Crim. App. 2000); *Munoz v. State*, 29 S.W.3d 205, 208 (Tex. App.—Amarillo 2000, no pet.).  The continuing course of criminal activities must encompass more than one crime or criminal episode.  *Munoz*, 29 S.W.3d at 208.  There must be an agreement

---

[8] As a factual issue necessary to establish the applicable range of punishment, the jury was also required to determine the applicable weight of the controlled substance delivered.

by the participants to act together in the continuing course of activity and it is not necessary that the participants know each other's identity or their particular role in the criminal activity. TEX. PENAL CODE ANN. § 71.01(a)(1).

A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Direct evidence of a culpable mental state is not required and may be proven by circumstantial evidence. *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002). "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime . . . . This has been the rule in Texas for over 100 years." *Id.* at 64.

Here, the indictment alleged that Appellant committed the offense with the intent to establish, maintain, or participate in a combination or in the profits of a combination with more than three individuals, including Kenneth, Joaquin, and Mandy,[9] who collaborated in carrying on the criminal activity by agreeing with one another to engage in conduct constituting the offense and by performing an overt act in furtherance of that agreement. The indictment listed numerous overt acts as to each individual, including Appellant, of possession, purchases, and delivery of methamphetamine, and the proceeds received therefrom. The indictment also contained references to handguns and forged check-cashing as part of the criminal enterprise.

In his oral and written statements, Appellant admitted to acquiring methamphetamine from Joaquin on multiple occasions, whether by purchase or in

---

[9] Including Appellant, the enterprise involved eighteen individuals.

17

exchange for favors. He also admitted he would resell the methamphetamine for profit to pay his bills. Appellant also confessed to being part of a check-cashing scheme with Mandy and Joaquin in which he cashed payroll checks with false identification provided by Mandy on at least two occasions. In each instance, Appellant kept more than half of the cash as his share of the profit. Kenneth, Joaquin, Mandy, and Appellant operated as a "combination" (three or more persons) for profit and collaborated in criminal activities, and from the evidence, it was reasonable to conclude that it was Appellant's conscious objective to engage in those illegal activities.

The trial court granted testimonial immunity to four of Appellant's co-conspirators: (1) Isidro Lopez, (2) Mandy Beth McKinley, (3) William Grant, and (4) Celina Rodriguez. Except for William Grant, who failed to show at trial, Isidro, Mandy, and Celina all testified regarding Appellant's participation in the combination by selling methamphetamine for profit.[10]

Although reluctant to do so, Mandy offered testimony that was illustrative of the "combination's" intent as well as Appellant's guilt. She testified that beginning in March 2014, she and Joaquin began using methamphetamine together. Using Kenneth as their source in Amarillo to obtain methamphetamine, she and Joaquin began making frequent trips to acquire methamphetamine. During that same time period, she met Appellant. She confirmed that Appellant made at least one trip to Amarillo with them and she observed Joaquin provide Appellant some of the methamphetamine for distribution to

---

[10] As accomplices, their testimonies required corroboration by other evidence tending to connect Appellant to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Other evidence tending to connect Appellant to the offense included his oral and written statements and Agent Ashburn's testimony as well as Appellant's cell phone, the contents of which were obtained with a search warrant. The jury was properly instructed on accomplice-witness testimony.

others. Mandy testified she never heard Joaquin and Appellant enter into an agreement to distribute methamphetamine; however, she also testified that Appellant was Joaquin's "right-hand man"—a claim vehemently denied by Appellant when he gave his statement.

Isidro Lopez was also in the business of selling drugs before Joaquin was released from jail. He was arrested on April 8, 2014. He testified that he went to Amarillo with Joaquin at least seven times beginning in March 2014. On all but one of those trips, they obtained four ounces (112 grams) of methamphetamine at a time from Kenneth. On one of those trips, Isidro bargained with Kenneth for two pounds (896 grams) of methamphetamine, using some cash and various stolen items as currency. He admitted delivering methamphetamine for Joaquin but denied having any agreement with Appellant to do so. Although he did see Appellant exchange cash with Joaquin for methamphetamine, he described Appellant as merely a "user," contrary to Mandy's testimony that Appellant was Joaquin's "right-hand man."

Appellant's former girlfriend, Celina Rodriguez, moved to Littlefield in March 2014. She moved in with Appellant after her mother kicked her out. She testified that Appellant regularly obtained methamphetamine from Joaquin. She saw Appellant give Joaquin cash for methamphetamine on several occasions and also saw him provide methamphetamine to several of his co-conspirators. During cross-examination, Celina's credibility was called into question when she admitted lying to Agent Ashburn about Joaquin's operation. Celina's cooperation was gained in exchange for a promise of help with regards to regaining custody of her children.

There was conflicting testimony given as to Appellant's role in Joaquin's operation. The jury, as the trier of fact, was free to resolve those inconsistencies in favor of the

verdict. *Jenkins*, 493 S.W.3d at 599; *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). Furthermore, even if there was no direct evidence of Appellant's participation in the delivery of a controlled substance, circumstantial evidence of his intent could have been inferred from participation with the group. *See* G*omez v. State*, No. 03-05-00842-CR, 2008 Tex. App. LEXIS 7919, at *5 (Tex. App.—Austin Oct. 16, 2008, pet. ref'd) (mem. op., not designated for publication).

In *Gomez*, the appellant was charged with engaging in organized criminal activity with two of his siblings. On appeal, the appellant argued the evidence was insufficient because the State had failed to prove that his sister, the third person necessary for a criminal combination, had agreed or conspired to participate in criminal activity. *Id.* at *3. In rejecting the argument, the court found that the jury could have inferred her involvement because his sister owned and arranged for utility services at the house where the drugs were sold and where a search warrant produced drugs, weapons, surveillance equipment, cash, drug paraphernalia, and other evidence used in dealing drugs. There was also evidence that the sister and the appellant's other sibling were drug users. *Id.* at *5.

Here, for purposes of establishing the delivery of a controlled substance, "delivery" means the act of delivering. TEX. HEALTH & SAFETY CODE ANN. § 481.002(9) (West 2017). "Deliver" means to transfer, actually or constructively, to another a controlled substance, regardless of whether there is an agency relationship between the transferor and the transferee. The term also includes offering to sell a controlled substance. TEX. HEALTH & SAFETY CODE ANN. § 481.002(8). Under this definition, in the context of an engaging in organized criminal activity offense, it is sufficient if any member of the combination

delivers a controlled substance to another member of the combination in carrying out the criminal objective of the combination.

Analyzing the evidence presented in this case against this framework, we observe that the prosecution inadequately accounted for the actual or constructive transfer of any specific quantity of a controlled substance, on any specific date, by a member of the combination to either another member of the combination or to the public at-large.[11] To a great extent, the jury was left to speculate as to just when and how much methamphetamine was transferred by Joaquin to Appellant, or from Appellant to anyone else. However, for purposes of our sufficiency analysis, the evidence was sufficient to satisfy the State's burden of establishing delivery if it established the delivery of the requisite amount by any member of the combination to any other member of the combination.

In that regard, the record establishes that on or about the relevant time period between March 1, 2014 to May 15, 2014, Kenneth delivered to Joaquin, Mandy, and Isidro (all members of the combination) more than the 200 to 400 grams alleged in the indictment. From that stash of methamphetamine, Joaquin delivered to Appellant (also a member of the combination) on numerous occasions for his use and further delivery at least 1.75 grams. Accordingly, the evidence is legally sufficient to establish that Appellant and members of the combination had the requisite intent to establish, maintain, or participate in a combination or in the profits of a combination, and that in the course of that combination Appellant committed or conspired to commit the predicate offense of

---

[11] As is evident throughout the record, the prosecution mistakenly relied on possession of a controlled substance, not delivery, as the predicate offense for engaging in organized criminal activity.

delivery of methamphetamine in an amount of 200 or more grams. Accordingly, issue one is overruled.

CONCLUSION

Because we cannot reform the conviction to any lesser-included offense as discussed hereinabove, the trial court's judgment is reversed and the cause is remanded for a new trial.


Patrick A. Pirtle
Justice


Publish.